I would like to be subject to the anti-terrorism and the threat of judgment at the actual level, and I'm concerned I don't attach to that. Mr. Laidlaw was advised to join the council. The council would be appointed for him, and there was a promise to the historic council that he would be given additional time to consider the matter, reflect on it, consult the council, that he denied, well, refused the opportunity to be represented in one of his awful matters right that day. Isn't the real question here whether he understood the 1958 proceeding? Well, then, what is there in the record that would allow us to disregard the credibility determination of Judge Giorgetta's testimony that he did understand the nature of the proceedings? I believe that Judge Giorgetta, first of all, applied the wrong standard in the sense that he was presuming that Mr. Laidlaw understood. Under a multiverse of illegal states that I recently advised the court about, he was required to conduct a penetrating and comprehensive inquiry to make a determination, a permanent determination, to determine whether he at all shared any intelligence in waiving his right to counsel. You're talking about the 58th hearing, or are you talking about the evidentiary hearing? I was answering Your Honor's question about the 1958 proceeding. Well, no, but there was an evidentiary hearing which went into all that and resolved the issue. And I thought that was Judge Nelson's question. He, at the evidentiary hearing, Judge Giorgetta said that he felt that your client understood the nature of the proceedings. Now, that's the key to this case. All right. And why don't we credit that? Well, in order to understand his testimony, one has to go back and look at the circumstances in 1958. And what Baselon said in 1972 testimony is apparent to Mr. Laidlaw that the standard that the judge was looking at was that he was presuming that Mr. Laidlaw was voluntarily intelligent in waiving his right to counsel. And I thank you for the specifics of how I arrived at that conclusion. Rather than conducting an inquiry, what the judge did was that he presumed that Mr. Laidlaw was voluntarily waiving his rights because he had another juvenile court contest. But he also testified in 1972 that a defendant of only the juvenile court experience should be ill-prepared to understand what was happening in his court. So therefore, his assumption that Mr. Laidlaw understood his ruling. And that was because, again, he said that somebody with that experience couldn't understand what was happening in his court. The judge knew that Mr. Laidlaw had a sense of feelings with the district attorney. And the district attorney told him that he was mentally ill. This was a cut-and-dry case. It would only take a few minutes of his time. Therefore, his inquiry was geared to that. And the judge in 1972 said, well, I assume that he had a preliminary examination. Again, assuming that he understood the nature of the allegation against him. Mr. Laidlaw waived his freedom after signing a form that he most likely couldn't read because the evidence was uncontested. It was illiterate. He certainly agreed that the evidence established and clear that Mr. Laidlaw did understand English. And the testimony from 1972 from his probation officer and things like that, he understood that before proceedings were done against him, the judicial court, which, again, is what Judge Giugietto is basing his significant part of Mr. Laidlaw's understanding, everything was patiently explained in words that he could understand. And that was Mr. Nelson's testimony, that I used words that he could understand. Judge Giugietto read them on a set form. He used terms like employing counsel, that you don't have the funds. And clearly, the court found that he had been advised. The judge assumed that Mr. Laidlaw understood and understood what was going on because he was employing the court instead of knowing around the restaurant so that the appropriate time. And, of course, Mr. Laidlaw didn't object to those proceedings because he knew that it was logical. And like the decision of the initial versus more, I mean, that was the important part of the entry here, didn't really give effect to the threats of the capital punishment against Mr. Laidlaw, but why he seemed so eager to resolve the matter that day. And in more, the Supreme Court concluded that the defendant wasn't entering the college later because of the stress, trouble, and the potential of a lynch mob. And the U.S. Supreme Court didn't object to that in terms of finding whether his waiver was intelligent, but the vast majority of the court didn't. Judge Chogetta didn't. And perhaps the Supreme Court wasn't aware of it. Like the judge in Michigan versus Newark, which I was certainly visiting in 1972 hearing, and that judge didn't give any instruction about it. See, all of that would be far more compelling if there had not been an evidentiary hearing at which the very identical issue was presented and resolved. Absolutely. I think one of the considerations, Your Honor, was that the defendant in 1972 was a vastly different individual than he was in 1952. Well, yeah. And presumably today he's even more vastly different from that. But, I mean, the point is there was a full evidentiary hearing at which he testified, the judge testified, anybody else could have testified, and a State court made a fact finding. And the fact finding was that his understanding of English was better than the claim. But, again, the unconfirmed evidence there was that the juvenile court proceeding wouldn't have prepared him to understand what was going on in Judge Chogetta's  which the judge said he fully recognized and appreciated, that the proceedings were different animals. No, that was the judge's scrutiny after the fact finding. No, that was his scrutiny after the fact testimony. You just want a different after-the-fact determination. I mean, the point is there was one. I don't see how we're here, quite honestly. You're really challenging the validity of a 1958 conviction. I am. And that was challenged in State court in the 60s and 70s, and there was a hearing. Well, when you look through the California State court proceedings, the evidence that there had been a 1972 evidentiary hearing wasn't brought forth. That's part of the, once we were in federal court and we were in a discovery court. Well, is the 1958 conviction still open to challenge in State court now? It is absolutely because it's not accepted by Lackawanna. That's my question. Because you have a Gideon issue here because he had no counsel at all as opposed to an independent. And that remains, the Gideon issue remains even though there were proceedings in 1972? Yes, Your Honor. That's the one exception to Lackawanna is the absence of counsel. Let me just ask you. Yes. Is there any indication, either in the 1958 proceedings or the 72 proceedings, that anyone explained to your client the consequences of pleading guilty or the nature of the punishment he faced? None whatsoever. The judge indicated that he failed to advise Mr. Labo because he had no statutory option. Mr. Labo, at the time, was facing a crime subject to doubtful punishment. And all that was told to him was that he had to plead guilty or he would be judged to serve. And that was something that was well accepted. He hadn't been advised of it either. He was threatened as in Moore. Is this very similar to the Moore case then? It's very similar. I believe that Moore is controlling him. And essentially, he didn't understand the consequences. Can you just tell me, because Judge Nelson is ahead of me here, what exactly was the challenge in the 72 proceedings? That he didn't know any of the methods in the way he tried to counsel because he didn't adequately understand the English language, and they also factored in the fact that he had been threatened. Okay. And your position is that the Gideon is still the Gideon exception is still applicable? Absolutely. Okay. You have about 30 seconds. We'll give you a minute. Good morning, Madam Chief of Court. My name is Brian Stein. I'm from the Judicial Office. I'd like to start setting the order in this case. The Court has now proposed that we apparently discuss an over-submission in that one, which is kind of like an idea statement. That's simply apparently the order. I do agree that it has some similarities with the Moore case, but I think there's I'm sorry. I do agree that there are some similarities between the over-submission case and the Gideon case. However, I do believe that the most crucial facts upon which Justice Brenner relied on when he wrote Moore v. Michigan are not present in this case. And for that reason, specifically, what I'm sorry to mention is the fact that in Moore v. Michigan, the 17-year-old defendant was a young black man in the South accused of killing an elderly white woman, and he was informed by the sheriff that there was a lynch mob outside. And the sheriff said, I don't know if I can protect you. You know, don't be guilty if you're not guilty. But if you do be not guilty, I can't guarantee you're safe. How does that differ from the sheriff saying a young, illiterate youth saying unless you plead guilty, you're going to get gassed? Well, the only premise of that question that the sheriff said that, I totally disagree with. That is only based on self-certain testimony of the defendant. Underlying Moore v. Michigan, where there was corroborating evidence from the sheriff that, in fact, there had been lynch mob outside, there was no corroboration to that statement whatsoever. There was no evidence to suggest that, yes, he was, in fact, told he was going to be gassed for certain if he didn't plead guilty. Is there any evidence at the 1972 hearing that Leyva knew the consequences of pleading guilty or the nature of the punishment? Because as I read Georgetta, he said, I didn't really tell him about the sentencing. Did anybody else tell him at any time? Is there any evidence in 58 or 72? As far as the record indicates, we've gone to the right fact that there was no specific admission telling him that you're anticipated sentence will be five years to life. I don't believe that there's any support record for that. However, the record does indicate that the defendant admitted that he knew he was facing five charges, including attempted murder and kidnapping. He knew that there was a potential of the death penalty for all those charges conceivably, however unlikely it might have been out of nowhere. Conceivably, under the law in Nevada at that time, he was actually subject to the death penalty. And he knew he was taking a substantial benefit of the dismissal of those exterior charges and one or two other charges by pleading to the rape. He actually got a sentence of five years to life and he was told after five years. So, I think, so there wasn't a specific, he wasn't specifically told that there was going to be a sentence. He knew he was getting a sentence. And that's another contrast to Morpheus, Michigan, where the defendant in that case got absolutely no benefit. Well, the fact that he eventually got the benefit, I think, is not, doesn't go to the question of whether he knowingly and intelligently waived his rights. That's one of the points that Justice Brennan pointed out in the majority opinion. And it did indicate that he didn't know what was going on, the defendant in Morpheus, Michigan. He was complaining that he had career sensations in his head and he needed to be examined. There's obviously a hint there that he had a potential insanity, but there's no such indication in this case. The other, the lich law, I don't, as I pointed out, I think the lich law, there's no equivalent to this. The more, or maybe it's unsupportable discussion that he was told he was going to be gassed or serviced, but it was found not credible by the Nevada State District Attorney. It was found by Judge Giorgetta and Judge Schenk quietly, because they resolved the incredible issue in favor of Judge Giorgetta. I just don't, I agree that... But George Giorgetta didn't comment on that at all. No, no. I was asking quietly because they were finding credibility, they were making credibility determinations vis-à-vis Leyla on one side and Judge Giorgetta on the other. They clearly were... Those were two different issues though. George Giorgetta was just saying, I think he understood. It had nothing to do with whether or not the statement about you're going to be gassed if you don't plead guilty. You know, I just, I just, I thought that we, we, we, we had Gideon in all of these cases in order to, to avoid having to do exactly what we're doing here and, and, and the, all of the Boykin involved, Rule 11 and all of this to determine whether or not a plea is voluntarily entered. And I, I'm still not quite understanding why the 1972 proceeding didn't take care of it and why more, we're still arguing more now, other than the fact that we asked you to. Well, the disproclamation was used to when he asked me to present his thoughts and he agreed. You see, I, the point is, you know, there's an evidentiary hearing in state court. Why doesn't he just end it? Yeah. I think, yeah. Okay. I mean, but that's your view, right? Yes. Okay. Then you can argue yourself out of that position. Yeah. I thought that's what you were doing. But the point is, it ends it. I was leading him on. I'll take this one. Thank you. Thank you. Well, look, the key thing is just what I just got through saying. I mean, Moore's on the book, so are a zillion other things on the books, including Gideon. But you had an evidentiary hearing in state court, which didn't exist in Moore.  It was a motion-free hearing. Here you had an evidentiary hearing that resolved the identical issue. Because of all the decisions that happened in the interim. And when we were in state court again, no one knew about the evidentiary hearing. That was discovered during the discovery. What does that have to do with the price of eggs? Well, that's why we finally got into federal court, was because we didn't know about the evidentiary hearing. It's a very brief record. I'd like to, if I could just... I know, but, okay. But just help me. I'm missing a... I'm just... Why does that matter, that nobody knew about it? Well, because while there were factual findings of the evidentiary hearing, it's argued that the decision was objectively unreasonable under those facts, because, again, the effects of the threats. And we believe that the accused... Okay, but that doesn't... That's just because you think it's unreasonable. It's not that you didn't somehow know about it. I'm sorry. I didn't hear you. I don't know. You just got through saying it somehow mattered that nobody knew about the evidentiary hearing? It was first elicited in federal court, in terms of how it got into federal court, was that no one knew about the hearing. Well, that's why the government is there to... Yes. ...to litigate. It was actually discovered in federal court, so... Yeah. So? Well, I'm... So now we know about it. Well, and I believe that we should still be here even if that case would have been discovered earlier, because, again, we believe that the decision was objectively unreasonable. The judge here said, well, he's not innocent, so therefore there's no harm in following it. Okay. And we believe that the court of inquiry is more of a security building, but that gave the Supreme Court no cause. We do. I think we do understand. Thank you. I just want to say, in terms of the corroboration of the threats, that that was corroborated by the judge that is looking for... That's fine. We understand. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the next case, Hightower v. Filer.
judges: Schroeder, D.W. Nelson, Rymer